**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                             :
**MEDINOL LTD.,**                                            :
                                                             :
                                  **Plaintiff,**             :
                                                             :     **OPINION AND ORDER**
                  **- against -**                            :
                                                             :       **03 Civ. 2604 (SAS)**
**GUIDANT CORP. and ADVANCED**                               :
**CARDIOVASCULAR SYSTEMS, INC.,**                            :
                                                             :
                                  **Defendants.**            :
                                                             :
-------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.   INTRODUCTION

Medinol sued Guidant alleging patent infringement.  During the course of a jury trial, the parties resolved the dispute when Medinol granted Guidant a license to use certain Medinol patents.  The parties notified the Court that they had settled the action.  Calling this a "delightful piece of news" the Court directed the parties to state the terms of their settlement on the record.[1]  An attorney for each side then outlined the settlement on the record and all parties agreed that the attorneys' statements accurately expressed the terms of their

---

[1]     Trial Transcript dated July 12, 2006 ("Trial Tr.") at 1551 ("This is a delightful piece of news, and I just want to place a minimum statement on the record to that effect so that I can discharge the jury at this time.").

agreement.  Medinol's lawyer summarized the settlement in the following words:

"Guidant will pay $[sealed] for a paid up license with respect to the '381 patent

and its family, and there will be a covenant not to sue with respect to actions in the

United States, and we will dismiss this action."[2]  In the colloquy that followed,

Abbott's attorney, Medinol's representative, and Medinol's counsel specified the

subject matter and geographic scope of the license, the breadth of the covenant not

to sue, and the nature of the dismissal.[3]  With these clarifications, Abbott's counsel

affirmed that the statements on the record appropriately summarized the terms of

the settlement.[4]  Representatives of both Medinol and Abbott[5] confirmed that they

---

[2]       Trial Tr. at 1552.  Months before the date of settlement, Guidant sold its stent business to Abbott Laboratories, Inc. ("Abbott").  Although this change in ownership is part of Guidant's argument regarding the scope of the license, I note here that although the parties never amended the caption to reflect this change, I will now refer to the defendants as Abbott, as there is no dispute that today it is Abbott, not Guidant, who is a defendant in this action.  I also note that the amount paid for the license has always been under seal and remains so today.

[3]       The settlement agreement "included [a license to use] patents, related patents, continuations and reexaminations" in the same family as the '381 patent. *Id.* at 1553; *see id.* at 1553-54.  The parties and counsel also specified that the geographic scope of the license would be the United States, *see id.* at 1553, that the covenant not to sue would cover "all of these [patents, related patents, continuations, and reexaminations]", *id.*, and that the dismissal would be with prejudice, *see id.*

[4]       *See id.* at 1554.

[5]       *See id.*  Because Guidant is no longer in the stent business, it is Abbott that will actually receive and pay for the license in question.

2

accepted the terms of the settlement as stated on the record.[6]  Though both sides still agree that the "settlement agreement stated on the record is valid and enforceable",[7] there is no doubt that the parties intended to prepare a written settlement agreement, setting forth the terms of their settlement in legal language and in complete detail.

Unfortunately, as the parties circulated draft settlement agreements, they found that they disagreed with respect to one essential term of the settlement: whether the license Medinol granted to Abbott was restricted with respect to Abbott's use of the patented technology.  Both sides agreed – and continue to agree – that the case was indeed settled, but each side argued that its interpretation of that one essential term was the correct interpretation.  Because the parties could not agree on this term, each side moved to enforce the settlement that it believed had been reached.  This Court referred those motions to the Magistrate Judge to prepare a report and recommendation to the Court.[8]  After receiving written submissions

---

[6]      *See id.* at 1555.

[7]      Medinol's Response to Defendants' Objection to Magistrate Judge Freeman's February 14, 2007 Report and Recommendation ("Medinol Mem.") at 16, *quoted in* Abbott's Reply in Support of Its Objections to the Magistrate Judge's Report and Recommendation Dated February 14, 2007 ("Abbott Reply") at 9.

[8]      *See* 8/17/06 Order Referring Case to Magistrate Judge, Document No. 132.

3

and holding an evidentiary hearing, the Magistrate Judge issued a sealed Report and Recommendation ("R&R") on February 14, 2007.  Abbott filed timely objections to the R&R.

## II.    THE AGREEMENT

When asked to place the settlement on the record, the parties made the following statements:

> Medinol Counsel:  Guidant will pay $[sealed] for a paid up license with respect to the '381 patent and its family, and there will be a covenant not to sue with respect to actions in the United States, and we will dismiss this action.
>
> * * * *
>
> Abbott Counsel:  If I could add at least one thing, and that would be a clarification on what [Medinol counsel] said about the '381 patent family.  That's all related patents.  It includes continuations, reexamination, anything that is related.
>
> * * * *
>
> The Court:  [Abbott counsel] stated it included patents, related patents, continuations and reexaminations.  Is that acceptable, Dr. Richter [Medinol representative]?
>
> Dr. Richter:  That's acceptable.  This is what we meant by the family.
>
> The Court:  It's best to be clear.  [Abbott counsel], is there anything else?
>
> Abbott Counsel:  I am not sure that [Medinol counsel] said there

4

would be a dismissal with prejudice.

The Court:  There will be a dismissal with prejudice; is that correct, [Medinol Counsel]?

Medinol Counsel:  Absolutely.

The Court:  Anything else?

Abbott Counsel:  Just to clarify, there is a covenant not to sue, paid up on all of these patents?

Medinol Counsel:  Yes.

The Court:  He actually said in the U.S.

Medinol Counsel:  This relates to the U.S. patents, your Honor.

* * * *

[Record indicates that Dr. Richter conferred with his wife, Dr. Judith Richter.]

Dr. Richter:  To clarify, I think we are saying exactly the same thing.  What we are talking about is all of the Israel patent family, its existing patents, continuation, reexamination of the Israel patent family.  Yes?

Abbott Counsel:  Yes

Dr. Richter:  OK.

The Court:  You keep saying all related to that.  That's a point that I am not quite getting agreement on.  You keep saying all related to that.  What do you mean by that, [Abbott counsel]?

Abbott Counsel:  This case has been about the '381 patent, but

there are other patents in the family.

The Court:  Try to explain what you mean by that.  You may be OK with each other, but you used all related.  That may be the problem.  Family means what to you, Israel patents?

Abbott Counsel:  Yes.

The Court:  And anything else?

Abbott Counsel:  No, Israel family.

The Court:  OK

Dr. Richter:  Israel family, continuation and reexamination.  We are talking about the same thing.[9]

After this colloquy, the court asked each party representative to confirm on the record that the terms of the settlement, as stated, were acceptable. Dr. Richter verified, on behalf of Medinol, "that the terms of the settlement stated on the record" were accepted "in full satisfaction of your claims in this action."[10] Dr. Schneiderman, on behalf of Abbott also confirmed that the settlement was acceptable.[11]  The parties then agreed that Abbott would make payment on the fully paid up license within forty-five days.[12]

---

[9]     Trial Tr. at 1552-1555.

[10]    *Id.* at 1555.

[11]    *See id.*

[12]    *See id.* at 1556.

6

## III.   THE DISPUTE

The disputed settlement term involves the scope of the license granted by Medinol – namely whether it is a restricted or unrestricted license.   Medinol claims that Abbott's license to use the '381 patent family is restricted in that the license allows Abbott to use those patents *only* in the Vision and Xience stents originally developed by Guidant (the "V/X" stents), and improvements[13] to those stents.[14]   In response, Abbott accuses Medinol of trying to add a term to the settlement that was never stated on the record, nor agreed to by the parties, to wit, the V/X field-of-use restriction.   Abbott argues that the parties agreed to an *un*restricted license, and that it may therefore use the '381 family of patents in *any* of its present or future stent products.

Though the parties stated several license restrictions on the record on

---

[13]   The term "improvements" has had several different meanings at various points during the parties' negotiations.  *See* R&R at 19 (finding that the parties proposed that "improvements" would mean "mere colorable variations," "insignificant" improvements, or "generational" improvements).

[14]   Terms that limit a licensee's use of the licensed intellectual property to certain industries, markets, or products are referred to as "field-of-use" restrictions.  *See* 2 Milgrim on Licensing § 14.26 (2007) ("Often a licensor will desire to restrict the use or uses to which the licensed matter can be put by the licensee.  Field-of-use licensing is both common and can be enforceable.  The very notion of a restricted use activity, however, calls for clarification in a description of the restriction.").

the evening on which this action settled,[15] it is undisputed that no field-of-use restriction was stated on the record.  Thus, it appears that Medinol is asking the Court to "clarify" the agreement by finding that the parties had agreed to a license that was restricted to only two products (and improvements thereto).  In its motion to enforce the settlement, Medinol argued that while no restriction on the license was placed on the record, this oversight was due to the court's request that the parties "place a minimum statement [of the settlement] on the record" and "generally state the terms of the settlement."[16]  Medinol also argues that the settlement was made between Medinol and Guidant, not Medinol and Abbott, which means that the license was necessarily restricted to Guidant products.

---

[15]     *See supra* note 3 and accompanying text.

[16]     *Id*. at 1551.  *See also* Medinol Mem. at 3.  Medinol explicitly disavows the argument that the Court somehow prevented it from placing all of the material settlement terms on the record.  "Medinol has never sought to blame any party, least of all the Court, for the statement that appears on the record.  Medinol has consistently acknowledged that the agreement, as stated on the record, is enforceable, and includes a license to the products at issue in this case (the "Guidant" products) and their improvements."  Medinol Mem. at 16.

8

Because the Magistrate Judge found that the terms of the settlement stated on the record were ambiguous, she held that she had the authority to clarify the terms of the settlement.  In order to do this, she held an evidentiary hearing in an effort to determine the true intent of the parties at the time of the settlement. Based on the testimony adduced at the hearing, including her findings as to the credibility of the various witnesses, she concluded that the parties intended to agree on a license restricted to only two products.

## IV.   THE REPORT AND RECOMMENDATION

### A.   Standard of Review

In the context of a Report and Recommendation, this Court must "make a de novo determination . . . of any portion of the magistrate judge's disposition to which specific written objection has been made."[17]  In this case, I need only review findings of fact if I agree that the Magistrate Judge correctly concluded that the terms of the settlement were ambiguous and that it was appropriate to hold an evidentiary hearing to determine the intent of the parties.

---

[17]     Fed. R. Civ. P. 72(b); *see also* 28 U.S.C. § 636(b)(1)(c) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

**B.      The Legal and Factual Bases for the Evidentiary Hearing**

The Magistrate Judge began her report by noting that "[a] stipulation of settlement made in open court is binding and enforceable" and that the district court has the power to enforce a settlement agreement.[18]  However, she also noted that after the terms of a settlement are placed on the record, a court "'retain[s] authority to clarify subsequently the settlement and to impose clarifying terms.'"[19]  Finally, she pointed out that "[a]lthough a court may only 'implement[] but not expand[] upon the parties' settlement agreement,' a court has 'ample authority to clarify ambiguities in the description of the settlement reached on [the record] by crafting the terms at issue."[20]

Based on these uncontested principles of law, the Magistrate Judge concluded that because the "lack of detail in the[] stated agreement creates uncertainty as to its meaning, the Court plays a proper role in undertaking to craft

_____

[18]      R&R at 4 (citing *Willgerodt v. Hohri*, 953 F. Supp. 557, 560 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998); *Hallock v. State*, 64 N.Y. 2d 224, 230 (1984); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.*), 336 B.R. 39, 58 (Bankr. S.D.N.Y. 2006)).  *See also Monaghan v. SZS 33 Assocs., L.P.*, 73 F.3d 1276, 1282 (2d Cir. 1996).

[19]      R&R at 5 (quoting *Manning v. New York Univ.*, 299 F.3d 156, 163 (2d Cir. 2002)) (alterations in R&R).

[20]      *Id*. (quoting *Janus Films, Inc. v. Miller*, 801 F.3d 578, 583 (2d Cir. 1986) and *Manning*, 299 F.3d at 164).

terms that resolve that uncertainty."[21]  The Magistrate Judge held that the court

would apply ordinary principles of contract law to determine the intent of the

parties.[22]  If the agreement was "complete, clear and unambiguous on its face [it]

must be enforced according to the plain meaning of its terms."[23]  If, on the other

hand, a contract is incomplete, or its language ambiguous, "a court may consider

extrinsic evidence to determine what the parties intended."[24]

The Magistrate Judge then found that the parties' statements on the

record were silent as to the scope of the license.  While noting that "the general

rule is that silence does not create an ambiguity," she nonetheless found that when

the parties' written or oral statement "is not a fully integrated and complete

statement of the parties' agreement, 'parol evidence may be admitted 'not to

contradict or vary, but to complete the entire agreement.'"[25]

---

[21]     *Id.* at 6 (citing *Manning*, 299 F.3d at 164).

[22]     *See id.* (citing *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d
425, 428 (2d Cir. 1992)).

[23]     *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002).

[24]     R&R at 6-7 (citing *Collins v. Harison-Bode*, 303 F.3d 429, 433
(2d Cir. 2002); *Coney Island Resorts, Inc. v. Giuliani*, 11 Fed. Appx. 11, 13
(2d Cir. 2001)).

[25]     *Id.* at 7-8 (citations omitted) (quoting *Laskey v. Rubel Corp.*, 303 N.Y.
69, 71-72 (1951) (quoting *Thomas v. Scutt*, 127 N.Y. 133, 138 (1891))).

The Magistrate Judge noted that the parol evidence rule generally forbids reference to oral agreements or other external evidence, but the rule does not apply where the agreement was not intended to embody the entire agreement between the parties.[26]  The Judge rejected Abbott's argument that "the parties' statement on the record is regarding the promised license reflects the entirety of the parties' agreement and is unambiguous[.]"[27]  She noted that in  *Core-Vent v. Implant Innovations, Inc.*, the Federal Circuit approved a district court's interpretation that a license included a field-of-use restriction "despite the absence of any restrictive language in the parties' on-the-record description of the agreed license[.]"[28]  Because the Magistrate Judge concluded that this agreement was plainly "incomplete" in that it was silent as to the scope of use permitted by the license, she decided that it was appropriate to consider parol evidence to determine

---

[26]     *See id.* at 8 (citing *Coney Island Resorts*, 11 Fed. Appx. at 13; *Smith v. Slocum*, 71 A.D. 2d 1058 (4th Dep't 1979); *Herrington v. Verrilli*, 151 F. Supp. 2d 449, 462 (S.D.N.Y. 2001)).

[27]     *Id.* at 9.

[28]     *Id.* (discussing *Core-Vent v. Implant Innovations, Inc.*, 53 F.3d 1252 (Fed. Cir. 1995)).  Though the Magistrate Judge is correct that the settlement did not contain language that explicitly restricted the *use* of the license, the license provisions were explicitly restricted as to *royalties*.  *See Core-Vent*, 53 F.3d at 1254.

the intent of the parties.[29]  In order to obtain that evidence, the Magistrate Judge

held an evidentiary hearing.  After hearing from various witnesses and considering

all of the evidence at the hearing, the Judge concluded that the parties had intended

to grant and purchase a restricted license, *i.e.*, one that limits Abbott's use of the

licensed patents to the V/X stents (and improvements thereon).

## V.    ABBOTT'S OBJECTIONS

Abbott begins with the simple proposition that a restriction on a

license is a highly material term and that Medinol's failure to mention any such

term when it stated the terms of the settlement on the record, while represented by

very experienced counsel, should end the dispute.  Abbott further notes that to add

such a term is not a mere "clarification," but is an impermissible "expansion" or

"variance" of the parties' settlement agreement.[30]  Abbott also argues that even

though most, if not all, settlements reached in open court are necessarily less

---

[29]    The Magistrate Judge also relied on the fact that because the parties "stated only 'the general terms of the settlement' (Trial Tr. at 1555) . . . [they never] suggested that the statement on the record represented the entirety of the parties' anticipated license agreement."  R&R at 9.

[30]    *See, e.g.*, *Manning*, 299 F.3d at 163; *Janus*, 801 F.2d at 583, *Laskey*, 303 N.Y. at 71-72.  *See also* Abbott's Objections to the Magistrate Judge's Report and Recommendation Dated February 14, 2007, at 13 ("the additional restriction . . . materially altered what the participants agreed to on the record"); *id*. at 14 ("this result cannot be defended under the pretense that it somehow represents only a minor 'clarification' of an already agreed-upon term").

detailed than carefully-drafted settlement agreements, courts typically will not look behind a settlement stated on the record because it will inevitably lead to a renegotiation of its terms, particularly by a party having second thoughts.  The fact that a settlement has not yet been reduced to a writing that includes every detail of the agreement should not be a "green light" to permit a party to "inject new, deal-altering restrictions" which were not "disclosed to the Court."[31]

Abbott next argues that "in exchange for a license under [a] patent . . . the licensee's acquired rights are coextensive with the full reach of the patents involved."[32]  Moreover, Abbott argues, "the customary import of a 'paid-up' license for patented technology is that the licensee has fully paid at the commencement of the license . . . to use whatever invention the patent in question

---

[31]    *Id.* at 8 (citing *Walkill v. Tesa Tape Inc.*, 982 F. Supp. 300, 302 (S.D.N.Y. 1997) (declining to interpret an in-court settlement to include an omitted provision finding that "[a] reopener provision represents such a clearly material term in a contract of this kind, and such a significant limitation on any covenant not to sue, that the parties, in setting forth the terms of their settlement in open court, unquestionably would be expected to state such a term if it were included.")).

[32]    *Id*. at 12 (citing *Rule v. Brine, Inc.*, 85 F.3d 1002, 1013 (2d Cir. 1996)).  This case is not especially helpful to Abbott.  In *Rule*, the Second Circuit noted that in interpreting royalty-bearing patent licenses, the default rule is that royalties must be paid for the entire *duration* of the patent term.  It did so to illustrate the error of the court below, which treated the royalty agreement as terminable at will (the Circuit noted that the terminable-at-will default rule is generally reserved for employment contracts).

purports to cover."[33]  Abbott goes on to make the policy argument that by agreeing

to a fully paid-up license, Abbott bore the entire risk of loss if any "future

iterations or innovations failed to gain FDA approval, or otherwise proved

unsuccessful."[34]  If the R&R is affirmed, Abbott argues, Medinol will be able to

challenge any of Abbott's future stent designs by "simply reasserting the same

patents Abbott has already paid to use.  In essence, the Recommendation will

propel the parties down a short path toward future litigation . . . ."[35]

       Finally, Abbott distinguishes the cases relied upon by the Magistrate

Judge in support of her decision to hold an evidentiary hearing that ultimately

resulted in the addition of a settlement term that was not found in the record.

Abbott noted that the Magistrate Judge placed heavy reliance on two cases – *Core-*

*Vent* and *Manning v. New York University* – in reaching her conclusion that in the

event of an ambiguity (or an incomplete statement) of a settlement, a court has the

power to examine the intent of the parties and "clarify" the terms of the settlement.

---

[33]    *Id*. (citing *Studiengesellschaft Kohle, m.b.H. v. Hercules, Inc.* *("SGK")*, 105 F.3d 629, 633 (Fed. Cir. 1997)).  This case does not support the proposition for which it is cited.  The *SGK* court rejected an argument that because a licensee held a "paid-up" patent license, it was not a "paying licensee."  But the court did not embrace the proposition that because a patent license is "paid-up" (as opposed to royalty-bearing), the presumption is that it is unlimited in scope of use.

[34]    *Id.* at 14.

[35]    *Id.*

Abbott points out that in *Core-Vent*, the Federal Circuit affirmed the district court's decision *not* to hold an evidentiary hearing. The Federal Circuit found that because the settlement on the record named the infringing products and tied the license royalties to those same infringing products, and because the parties affirmatively assented to the settlement as stated on the record, the district court acted properly when it denied the defendant's request for an evidentiary hearing and found that the settlement license was restricted to the products for which royalties were to be paid.[36] Here, according to Abbott, the situation is the mirror image. The present settlement license contained no product restriction – yet Medinol now seeks to impose such a restriction. Abbott also notes that in *Manning*, the Second Circuit rejected a *pro se* plaintiff's attempt to obtain an evidentiary hearing as to the intent of the parties in reaching a settlement, finding that the final written settlement agreement (which included clarifications by the court) did not modify the settlement terms placed on the record.

---

[36]   *See Core-Vent*, 53 F.3d at 1258-59.

16

## VI.   MEDINOL'S RESPONSE

Medinol responds to Abbott's objections with two principal and related arguments.  Acknowledging that the settlement stated on the record is valid and enforceable, Medinol first argues that the settlement contained "a limitation of the scope of the license:  the reference to 'Guidant'".[37]  As a corollary, Medinol argues that the parties were only litigating the products that had been sold by Guidant – namely the Vision and Xience stents.  Medinol's second argument, flowing inexorably from its first, is that it is Abbott, not Medinol, that is seeking to add a term to the settlement – the term that the license is *un*restricted – when no such term was stated on the record.[38]

In sum, the parties agree that the words that appear on the record embody a valid and enforceable settlement agreement.  Abbott argues that the agreement does not contain a field-of-use restriction, and that Medinol is attempting to add one after the fact.  Medinol argues that the parties' use of the term "Guidant" is a field-of-use restriction, and that Abbott is attempting to add licenses for products other than the V/X stents.

---

[37]     Medinol Mem. at 17.

[38]     *See id.*

## VII.   DISCUSSION AND CONCLUSION

I begin by confirming the important point with which the Magistrate Judge began her Report and Recommendation.  A settlement stated on the record is "one of the strongest and most binding agreements in the field of the law" and is thus entitled to substantial deference.[39]  A court should be extremely hesitant to pry into the thoughts and motives of the parties after the fact in an attempt to discern their intent in settling a case.  There are many reasons to settle a matter and a court is not in a particularly good position to understand those reasons.  It almost goes without saying that an oral statement of a settlement is not fully integrated and complete.  It is, by definition, an outline of terms that the parties later intend to flesh out and reduce to writing.  "A trial court['s] inherent power to enforce summarily a settlement agreement where the terms of the agreement are 'clear and unambiguous' . . . is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings.'"[40]  A settling party – no matter how acute its buyer's remorse –  may not assert

---

[39]    R&R at 4 (quoting *Nisselson*, 336 B.R. at 58).

[40]    *Omega Eng'g*, 432 F.3d at 444 (citations omitted) (quoting *Janus*, 801 F.2d at 583).  *See also Core-Vent*, 53 F.3d at 1258 (approving district court's entry of a judgment interpreting and enforcing the parties' oral settlement agreement after the parties failed to provide a written license detailing the terms outlined in the oral agreement).

ambiguity to undo the settlement when the record contains an agreement that is

clear on its face.  The mere fact that a settlement is stated orally and in outline form

should not be a license for courts to circumvent the parol evidence rule with

evidentiary hearings.  Such circumvention transforms final, unambiguous in-court

settlements into litigation ploys.

      I conclude that the terms of the settlement were clear and

unambiguous.  As a result, there was no need to hold an evidentiary hearing.

When the terms of a contract are clear, it is error to cite extrinsic evidence in order

to interpret that contract.[41]  "Importantly, the determination of whether contract

---

[41]    *See, e.g.*, *Waldman v. Reidinger*, 423 F.3d 145, 149 (2d Cir. 2005); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). Medinol cites several opinions for the proposition that it was proper to hold an evidentiary hearing in this case. *See* Medinol Mem. at 14 (citing *Omega Eng'g*, 432 F.3d at 443; *Monaghan v. SZS 33 Assocs., L.P.*, 875 F. Supp. 1037, 1042 (S.D.N.Y. 1995); *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987); and *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983)).  None of these cases supports Medinol's proposition.  In *Omega*, a hearing was conducted to determine whether the parties intended to be bound when they had agreed to a written settlement agreement, which agreement one party later refused to execute.  *Callie* dealt with an evidentiary hearing to determine whether one party's conduct constituted assent to proposed settlement terms.  *Ozyagcilar* held that an evidentiary hearing is appropriate when one party argues that there has been no meeting of the minds.  In the present case, both parties agree that there was a meeting of the minds and that both parties gave knowing, affirmative consent to be bound to the settlement stated on the record.  *Monaghan* is also distinguishable; it dealt with the factual issues to be considered when a court decides whether to enforce an *off*-the record settlement despite "the general rule in New York [] that oral stipulations of settlement will not be enforced unless made on the record in

language is unambiguous 'is made by the court with reference to the contract alone.'"[42] "In the circumstances of this case, there were no[] disputed issues of material fact that required a hearing.  Here, the parties stated on the record both the terms of the settlement and their unqualified agreement to it. '[N]o hearing is necessary where there is no dispute as to the existence of a settlement.'"[43]

The long and short of it is that the settlement placed on the record by the parties on the evening of the settlement contained no field-of-use restriction. The license Medinol gave Abbott to use the '381 patent family included a geographic limitation and was specified to include "related patents, continuations and reexaminations," but was unrestricted as to its use.[44]  "This case demonstrates the validity of an old legal truism:  God may know but the record must show."[45]

---

open court[.]"  *Monaghan*, 875 F. Supp. at 1042.

[42]     *Waldman*, 423 F.3d at 149 (citing *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir. 1991)).

[43]     *Core-Vent*, 53 F.3d at 1259 (quoting *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991)).

[44]     Trial Tr. at 1553.

[45]     *Jones v. Vacco*, 126 F.3d 408 (2d Cir. 1997) (citing *Peoples Coin Laundromat Corp v. Beckmann*, 190 N.Y.S.2d 131, 133 (Sup. Ct. Nassau Co. 1959)).

To reach this result, I need only address Medinol's argument that a field-of-use restriction was indeed stated on the record by way of the parties' consistent reference to the settlement between Medinol and *Guidant* and to the license Medinol granted to *Guidant*.  Medinol's reliance on this argument will not carry the day.

It is uncontested that "Guidant sold its entire vascular intervention business – including its stent business – to Abbott."[46]  On April 21, 2006, after this sale, Boston Scientific Corporation acquired the remainder of Guidant.[47]  Thus, by July 12, 2006, the date of the settlement, Guidant was no longer in the stent business and had no use for this license.  This chronology shows beyond a doubt that both parties knew that Abbott was the intended licensee, not Guidant.  In addition, even under the Magistrate Judge's interpretation, the license covered "generational improvements" on Guidant's existing stents.  It is obvious that Guidant would make no "improvements" as it was out of the stent business.  This, too, reveals that Medinol negotiated a fully paid-up license with Abbott, not

---

[46]     Abbott Reply at 2.

[47]     Abbott purchased a relatively small portion of Guidant.  To avoid potential antitrust problems, Guidant sold its vascular intervention division to Abbott for $4.1 billion before Boston Scientific purchased the bulk of Guidant for $27.5 billion.  *See* Francine Knowles, *Abbott Expects $4.1 Billion Deal to Pay Off in Long Run*, Chi. Sun-Times, Apr. 22, 2006, at 25.

Guidant.  Finally, the settlement stated on the record indicates that "Guidant will

pay $[sealed] for a paid up license."[48]  Obviously, this payment would be made by

Abbott, not Guidant.

Medinol's argument – that the use of the term "Guidant" was the

equivalent of stating a product restriction on the license – is a leaking sieve.  In a

declaration filed in support of the motion to enforce the settlement, Medinol's head

and founder, Dr. Jacob Richter, stated that the intended license had evolved to

include "colorable variations" of the V/X stents.[49]  Clearly, Guidant was incapable

of making *any* variations – only Abbott was in the business of manufacturing

stents.  Thus, Medinol's interpretation of a field-of-use restriction to those products

manufactured by Guidant – the V/X stents – makes no sense because it is *Abbott*

that will continue to develop and market stents, including variations on the

V/X stents.  Medinol's interpretation also supports Abbott's argument that in

agreeing to the product restriction now urged by Medinol, Abbott would be buying

a future litigation.  There can be no doubt that it is Abbott that will manufacture

and sell the Xience stent (which was never sold by Guidant) and that will create

---

[48]      Trial Tr. at 1552.

[49]      Declaration of Dr. Jacob Richter, dated September 6, 2006 at ¶ 2.

"improvements" to the V/X stents.[50]  If Abbott had agreed to the product restriction that Medinol now argues is found in the plain language of the settlement stated on the record, Abbott would face a new patent infringement suit every time it developed a new generation of the V/X stents.  This result defies the record, logic, and common sense.

Moreover, to enforce a restriction such as the one now urged by Medinol would be bad policy.  For an on-the-record settlement agreement to be enforceable, each party must have an opportunity to be heard as to the settlement terms, including an opportunity to clarify, correct, or object to the other party's statements or omissions regarding the settlement agreement.  Medinol had the opportunity to state the terms of the settlement (which it did), including field-of-use restrictions (which it did not), and to voice any objections to Abbott's statements or omissions.  Abbott had the same opportunity, which it used to add or clarify several terms, including the patents licensed and the geographic restriction.  For a court to impose a field-of-use restriction at this stage would deny Abbott the opportunity to object to such a restriction.

---

[50]     The parties' lack of consensus on the definition of "improvement" further undermines Medinol's position that they agreed to a restricted license.  *See* R&R at 19 (discussing various proposals for restrictions in negotiation).

In all, the missing term is clearly material and very important.  If
Medinol had meant to restrict its license to two products it had only to say so on
the record.[51]  If this term, which it now deems critical, had defeated the settlement,
then so be it.  It is unfair at this stage – to both Abbott and the Court – to ask the
Court to read language into the agreement that was not stated on the record.  I
reach this conclusion even while mindful of the fact that the parties' negotiating
history supports the Magistrate Judge's conclusion that up until the evening of the

---

[51]     *Core-Vent* is illustrative on this point:

> Mr. Beaty, the president of [defendant-corporation], stated . . . that
> it was his "understanding"' at the conclusion of the settlement
> discussions that one of the "core" settlement terms "was that the
> parties would enter into a written license agreement . . .", and that
> "I would not have indicated my assent to the core terms of the
> parties' settlement read in open court [which did not contain such
> a term] had I believed that this term was not part of [the]
> agreement . . . ."  If that was Mr. Beaty's understanding of the
> settlement, he should not have indicated his agreement with the
> settlement as stated in court, but should have insisted that it
> include a provision providing for a separate patent licensing
> agreement and defining its terms.  Instead, he accepted the
> settlement without equivocation.  "A settlement agreement is a
> contract."  *Mahboob v. Department of the Navy*, 928 F.2d 1126,
> 1128 (Fed. Cir. 1991).  "Since contractual obligations are to be
> ascertained from objective manifestations of intent, plaintiff's
> mental reservations are legally irrelevant."  *David Nassif Assocs.*
> *v. United States*, 557 F.2d 249, 257 (Ct. Cl. 1977).").

*Core-Vent*, 53 F.3d at 1256.

settlement, the parties had negotiated both a restricted and an unrestricted license to Medinol's '381 patent and the family of related patents, and that in their most recent discussions they had focused on a license limited to the V/X stents. Nonetheless, when the parties reached a settlement and placed it on the record, they stated no such restriction. I decline to add a material term to an agreement that was never expressed on the record.

For these reasons, Abbott's motion to enforce the settlement is GRANTED and Medinol's motion is DENIED. The parties are directed to prepare a judgment in accordance with this Opinion and the Clerk of the Court is directed to close this case upon entry of the judgment.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 7, 2007

25

- Appearances -

**For Plaintiff:**

Rory O. Millson, Esq.
Keith R. Hummel, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY  10019
(212) 474-1000

Christopher A. Hughes, Esq.
Dorothy R. Auth, Esq.
Morgan & Finnegan LLP
345 Park Avenue
New York, NY  10154
(212) 758-4800

**For Defendants:**

J. Michael Jakes, Esq.
Gerald F. Ivey, Esq.
Michael A. Morin, Esq.
Christine E. Lehman, Esq.
Robert F. Shaffer, Esq.
Finnegan, Henderson, Farabow, Garrett & Dunner LLP
901 New York Ave. N.W.
Washington, DC  20001
(202) 408-4000

R. Scott Garley, Esq.
Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY  10019
(212) 613-2000